Oral argument not to exceed 15 minutes per side, Ms. Sinkovich for the Plaintiff's Appellant. Good morning, your honors. My name is Madeline Sinkovich, and I'm here on behalf of the appellants, the plaintiffs of the District Court, Mr. David Henry and Ms. Heather Williams. I would like to reserve three minutes for my rebuttal, please. Thank you. Plaintiffs bring this appeal on the basis that the District Court committed reversible error in several aspects, but specifically on the whole, plaintiff's arguments go to that there exist questions of fact as to the reasonableness of the officer's conduct in this case, which makes summary judgment and qualified immunity here inappropriate. There are five arguments that I would like to make today, and I'll briefly go over those. First, Officer White, one of the police officers in this case, is not entitled to qualified immunity on plaintiff's claims of excessive force because there is a question of fact as to whether Mr. Henry was handcuffed too tightly and whether his complaints were ignored by Officer White. Officer Coe, another police officer in this case, is not entitled to qualified immunity on plaintiff's claims of excessive force as well because there exist questions of fact as to the reasonableness of his decision to pepper spray the plaintiffs. The third point I will be making is the officers are not entitled to qualified immunity for the arrest of Mr. Henry because no reasonable officer would have found Mr. Henry's conduct violated the Flint Ordinance in this case. Reasonable officers are expected to know the law they are charged to carry out, and the circumstances here did not rise to the level of those required by the Ordinance. Fourth, the officers are not entitled to qualified immunity on plaintiff's claims for a retaliatory arrest because Mr. Henry here did engage in some protected conduct, and there exist questions of fact as to the reasonableness of the decision to arrest him and the finding of probable cause. And finally, Defendant White here is not entitled to qualified immunity on plaintiff's claims for failure to provide a medical treatment because there are questions of fact as to whether Mr. Henry was suffering a serious metal cleaning in the back of the car and whether Officer White knew that. As to the handcuffing claim, I hear the court relied on the dash cam video in making its conclusion that no violation occurred. However, Mr. Henry did testify that he asked for the handcuffs to be loosened because they were too tight and they were hurting him. In his deposition, he did testify that it took three weeks for the cuts and scabs that he got on his wrists to heal. And this circuit, in the case of Morrison v. Board of Trustees v. Green Township, has rejected the argument that bruising, skin marks, and attendant pain were legally insufficient to meet the physical injury component of the injuries. The facts the court did rely on also do include questions of fact. I hear Mr. Henry can be heard on the in-car dash cam like complaining that the cuffs were cutting him and that's kind of how he said it. And Officer White was driving the car and he did admit to hearing him in the back seat over the course of the drive. So am I correct that Mr. Henry first complained about the tightness of the cuffs? I guess he says this thing is cutting into my thing. And he says on a couple times, I think. But that occurred before the transport to the jail or police station, did it not? I mean, the complaint, from what I can see from the video, occurred while Mr. Henry was in the car and before the transport. So the transport was only a couple of miles, a little bit over a couple of miles. But looking at the video, it looks like the cuffs were on him for about 15 or 20 minutes from the time he first complained until he got to the station. Am I correct about the timing? I think he did complain while in the car. I'm not sure. He also testified that he... Right at the beginning, before the drive had started. Yeah, before the drive had started. That's when you can hear him on the dash cam. Because he first complained before the drive had started. That is when you can hear it on the dash cam. He also testified that he asked the cuffs to be removed, but he didn't give a time when he asked them. He said he thought he asked before he got there, but didn't remember asking when he got there as well and then being really loosened at the station. The only evidence I saw of him asking was him saying, this thing is cutting into my thing. Is there any other? His testimony. He did testify that he... He specifically testified that he did ask for the cuffs to be loosened. Right, but I mean, did he clarify the timing? When? No, he did not clarify the timing. I assume it was what we saw on the dash cam. It was the dash cam. The dash cam was prior, it was during those 15 minutes, right? He complained while he was in the car, and our position is that Officer White could hear him complaining about this in the car. The court found even... But it's his testimony. I think what Judge Sutton is saying is testimony that he asked to have the cuffs loosened. Why isn't it the quoted, what he said, what he said in the video as he's in the backseat of the car before the transport begins, where he says, this thing is cutting into my thing. That would seem to be the request he made to have the cuffs loosened, or that they were too tight, that there's not an additional request. Now, that is unclear from his testimony. That, I admit, that is not clear, whether he... He suggested he asked more than once, but he can't really remember because he's mostly focused at this point on his eyes and the other symptoms that he's experiencing in the back of the car. I was just trying to get a sense, if you know, for the relative length of time the cuffs were on him from the time Mr. Henry first made a complaint about the tightness of the cuffs. That I do not know for certain, Your Honor. So, I mean, this is kind of following up on that point. I mean, the... Let's accept that the officer should have heard that. I mean, his back's to him, but let's assume that. So, you have the whole ride. I mean, it's not a long ride, and he's by himself, so that's a little bit of a complication in terms of making an adjustment. I can imagine a little bit of a risk there. When you look at these cases, don't they involve more than one complaint like this? I mean, you know, it's a short ride, so you can imagine the officer on him, by himself, saying, let's just get this to the station. We'll deal with it there. When you look at cases where you have a triable issue of fact, isn't there more than one complaint, or is that not true? Your Honor, I have not found that to be a dispositive factor in this analysis. Yeah, I hear you on that. It's just that's one of the three elements that must be met to present this handcuffing claim, but I would like to address the length of time of the ride to the station or the ride to jail. I watched it. Go ahead. Yeah, because in this court, in Baines v. Cleland, actually went over and reviewed the cases cited by defense on this point, Fetz v. Hendershot and Lee v. Norwalk, and Baines refused to follow those cases because it found that they too narrowly tried to narrow what was a clearly established right. Because in Fetz and Lee v. Norwalk, they said it was only a short ride to the station, therefore it wasn't unreasonable. However, Baines rejected that. While it was on the clearly established portion of the law, they still found that that short ride didn't change the clearly established right that an individual has. So while it was a short distance to the ride, I believe the Sixth Circuit has rejected that as a dispositive factor. What relevance is it that the officer was by himself? I mean, would the answer be, well, if there's a problem, you got to stop the car and fix the problem. That would be the answer, Your Honor. But in this case, it's compounded by the other elements that he's experiencing. Like Officer White, the driver, does realize that he believes Mr. Henry was in pain. He knows that. He testified that he assumed Mr. Henry was in pain. But yeah, what you're struggling with is why it does seem to be the main source of the pain during the ride does seem to be the pepper spray with the snorting and complaints. However, his convulsions and his body is reacting. I would agree that. And he testified that that was the main source of his discomfort. However, I do believe he has presented evidence to meet the three elements of the handcuffing claim in this instance. As for the pepper spray, in the circuit, excessive force is used when Officer Pepper sprays someone who hasn't been told they're under arrest and isn't resisting arrest. And this is in Gravey v. Drury, and here there's no evidence that the plaintiffs were ever told they're under arrest. In fact, the only evidence that there was that an officer did tell Mr. Henry he was under arrest, he clarified in his deposition transcript that Officer Occo did not actually ever tell Plaintiff Mr. Henry that he was under arrest in this case. As for resistance, the district court relied on the officer's testimony and the video that Mr. Henry was resisting. However, I would like to point out that the video at this point only contains audio and it doesn't actually show a, it doesn't show resistance. It, perhaps you could infer that there was a scuffle going on, but it doesn't, it doesn't show that. Doesn't his, didn't his girlfriend testify, Ms. Williams, that he was, I think, struggling with the handcuffs. But the officer, the officer was trying to cuff him. She did testify that, but on the very next page of her deposition, the very next question, she actually cleared that up a little bit and said that he wasn't told he was under arrest and the officers just immediately sprayed him and took him to the ground. So I, she did say that, but then the next sentence she cleared it up and said, well, they never told him he was under arrest. They just grabbed him. So while she, I, she did say that. However, I think in the context that wasn't necessarily her answer to the question. The video, back to the video, one thing is that, the video does evidence the officers telling Mr. Henry to put his hands behind his back several times. That's not denied here. However, the video also, you can hear one of the officers saying, don't hit me. And Mr. Henry is saying, I never hit you. And so we, right there, we can't tell who hit who. And I think that goes to the question of fact to the video where there's... Video, do you mean audio? Yes. Because the main video in this case has video for the first half and then just audio for the second half of, you know, blurry, it's scuffling around. So that's, that was my point there. At the, for the resistance, the resistance isn't caught. You don't see Mr. Henry punching or kicking anyone, but you do hear a dispute, another factual dispute right in the audio. Once someone's saying they kicked and someone's, or hit and someone's saying, no, I did not hit you. So you're saying there's a dispute of fact as to a justification for a pepper spray, because your theory is he wasn't resisting being arrested at all. And whether he was resisting, yes, was a question of fact, because you can't tell from the video that was relied on by the officers and Ms. Williams' testimony, it was not the full context of what she was trying to say that was relied upon by the district court. And just one more thing about Ms. Henry being pepper sprayed. She testified that her eyes hurt for an hour and a half from being pepper sprayed. I think that's a little bit more than just a little bit on the face perhaps. And she never testified that no one meant to spray her. The district court found that it was inadvertent. And so there was no constitutional violation against Ms. Williams. However, the case that the court cited was Wilkinsburg City of Royal Oak. And that's a district court case that relied on a Ninth Circuit case. And the Ninth Circuit case found that negligent inadvertent conduct doesn't rise to the level of a constitutional violation. However, that case, Ninth Circuit was later distinguished by another Ninth Circuit case, the 14th Amendment, and that there's no specific intent. But what's, what's your, your theory with her? I mean, is your theory that they just were frustrated with her too and just went and sprayed her? That she was standing right where they were spraying. Well, I know, but, but, but what are you saying? It was inadvertent or not. The opposite of inadvertent is they decided you're, you're annoying. We're going to spray you and get you out of this as well. Is that what you think? Well, I'm, I'm arguing that there, that his decision to pepper spray was intentional and that she was right next to him. He sprayed at, he sprayed at the plaintiffs and Ms. Henry or Ms. Williams' testimony is that they sprayed us. So she was so close that any spray that came from him was coming at her as well. Well, let me put it a different way. If there's not a triable issue of fact about whether he should have been pepper sprayed, does that eliminate her claim? Or does she have a freestanding claim that they gratuitously pepper sprayed her? I think her claim would go to the Mr. Henry's claim as well, because if they had a right to pepper spray Mr. That was found and I think that would make it justifiable anything they used against her. However, because that's a question of fact, I don't think we can come to that. I know. Your honors, I see that my time is up. Would you like to ask me any more questions? Or I'll probably just wait to rebuttal. Thank you. Thank you. May it please the court. I'm Michael Gus representing a city of Flint, a police officer, Sean Michael Hennigy and Nicholas White. I'm requesting that the court uphold or affirm the decision of district judge, Paul Borman. I'll address basically plaintiff's arguments. I don't believe that the plaintiff comes to a situation or appellant where there's credible evidence. They're making arguments, but without reasonable inferences and without evidence. If we start with Mr. White in the issue of cuffing. Mr. White testified that he was told at the jail that the cuffs were too tight. Counsel has referenced that her client didn't specifically say when he said that they were too tight. We have the, we have the utterances in the vehicle, which are not clear as to what they are. And he says that, do you, don't you think you can hear from the dash cam that he's complaining about the cuffs? I don't think those statements are clear. The cutting my honor, I mean, there's some muttering, but it's difficult to tell that he's saying cuffs could it be, what else could he be referring to? I he's writhing in the back of the car. He there's not a statement of handcuffs. That my handcuffs are too tight. There's not a clear statement. Um, officer white, his testimony is that they have older, uh, squad cars that the windows are down. Uh, that would noise. Uh, you don't hear all that much in the back, but he had been hearing the same noise since he put him in the vehicle, uh, because he is trying to clear himself of mucus and, uh, uh, mucus and tears or whatever from the CO spray, but there's not a definitive statement, uh, of record of him stating that I told the exact time that he told them when the cuffs were bothering him. And officer white says is at the jail when we took him off really soon. And then the other utterances in the vehicle are not definite or certain and not heard. So, um, I, I don't see where there's a fact question made there at all. Um, because the, the inference that come from it, the cutting my arm, uh, it doesn't equate to the handcuffs are too tight, not a specific statement. At any time that a handcuffs are too tight, obviously, um, you know, he's reacting quite significantly to the, uh, CO spray with regard to clearing himself from mucus and spit, but he's spitting and working in the back of the vehicle. Um, so it's our argument here that there's not a contest of evidence there. There's not a clear statement that my handcuffs are too tight. The only evidence of a testimony is white saying he told me at the jail and I took them off. So that's number one. If we go to CO and pepper spraying, if I could just ask you, you mentioned officer white, I guess it's not clear to me and maybe you're, you're probably right when I look at his, uh, it must be his deposition testimony where he says, uh, uh, some of the question was then who, who put the handcuffs on him? Henick question. And he was crying that the handcuffs were too tight, right? The answer is I'm not sure if he did initially, but he did make mention of his hands being hurt. So I don't know if that, if the inference there is that was later. And, and the next question, he was crying that they were too tight, that they were cutting into his skin, right? I don't recall that, but I remember mr. Henry complaining of his hands being hurt from the handcuffs. And you're my point is that was made, that complaint was made at the station and not, that's not the complaint that was made while he was in the testimony. You're cited was cited by council in their response to the SD motion. And judge Borman specifically states that that's improperly cited, uh, in his decision because later white clarifies it in later pages. I don't know the page site at the top of my head, but white clarifies it. That that's it. What does he clarify that the complaint was made at the station and not? Yes. Yes. Then you don't have the record site for us on that. I, we can, we can find it. But just making, I want to make sure I'm following the train of this. I came to the case thinking, giving the inferences to Henry that he had registered a complaint before he got to the station. You don't think that's the way I have to look at it? No, I don't. Because there's no, uh, evidence that the, uh, officers heard it. Um, it's in the back you're, you were suggesting relying on that. That's a tribal issue. Fact. I mean, if, if the, um, plaintiff says, I said this to them, the officer says, I didn't hear it. Um, you get to go to a jury. If the plaintiff says, I told them this. Plaintiff said, I told him this not setting a time parameter. White says, yes, he told me it was at the jail. There's not a fact question there. That it's entirely consistent. There's no, there's no issue between those two statements. Um, and then with regard to the matter of the vehicle statement, there, there's nothing clear in the vehicle. They're, they're uttering and muttering. There's nothing saying that the handcuffs are too tight. Tribal issue. Fact. I mean, you don't have to use the word handcuff. You can say my wrists hurt. He didn't say my wrist hurt. Oh, you could say that you're right. And then you'd put the police officers on notice. But I'm making the point. You could have a tribal issue fact about whether the complaint was specific enough for a reasonable officer to know there was a handcuffing problem. That strikes me as a potential tribal issue. Fact. I, I think the police officer has the real point is not in this instance is all you're really saying. You don't think it's, there was enough here. Uh, there's definitely not enough there. There's not a specific statement in your own example of, you could say my handcuffs are too tight. He didn't say that. He made some other utterances. Uh, he did not make statements that my handcuffs are too tight with any definity that the, and the officer didn't hear it. The only evidence with regard to him clearly complaining that my handcuffs are too tight officer white identifies as having at the station. But, but aside from that, there are this are the couple of cases that it's not for a long period of time. Anyhow, uh, the record is 10 to 15 minutes. Uh, at one point the plaintiff said that at his testimony and otherwise, we have a 2.8 mile ride that the plaintiff identified because he said he wrote it. Uh, another time to see how far it was. Should I proceed? Yes, you may continue with your argument. When we get to a call in the pepper spring, uh, again, the video is the best thing you have to understand. This is the plaintiff's cell phone that he brought outside. All the officers know he's holding a cell phone and, uh, uh, when he's out there, uh, this whole time and what happens is after the final, uh, matter that, uh, he had been already been told, I'm concerned about the neighbors and then there's light going on. And again, with regard to the light, the plaintiff never says the light didn't go on. He said he couldn't say either way, but that light is identified as going on. So he's warned. Um, they could have arrested him. The other, the other officer says he didn't see any light going on. Well, he didn't see the light proving a negative. That is how do you say, I didn't see any light when there wasn't any light, right? There wasn't like a light test. I mean, nobody was filling out paperwork for it. It was simply a matter of what you saw and seeing somebody flick on a light switch on a, you know, some house in an area is, I mean, I don't see where from what, you know, everybody who sort of watches the videos, like a movie, uh, there's a neighboring house where the lights on all along, it's like a porch light, right? If you look at one of the street shots, yeah, the record's murky as to the light going on, but that a light went on in a neighboring home and the officers are not, one officer says he says, uh, saw who's probably the most aggressive one. Co white, I think says, you know, he didn't see anything. Henry says he didn't see anything or didn't, but not seeing things. It doesn't, it doesn't mean the light didn't go on. And that could be a question of fact. Well, um, what happens at that point, he had been threatened repeatedly. Repeatedly. He'd been told to quiet down. You're going to disturb the neighbors. And he kept up with, well, as I understood it and help me here, the one statement about the neighbors is the language is getting a little more aggressive, uh, but, and, but co just says, I'm just worried about you bothering the neighbors. That's the only thing I remember from the record about neighbors. Is that right? Correct. And then co says he sees a light at some point after that. But, and at that point, things kind of really escalate because Henry says, I'm not bothering anybody. You're bothering people. But is that, is that what you rely upon, uh, as the warning necessary under subsection five? Yes. And, um, uh, again, the matter is not whether or not, uh, appellate attorneys can argue at the sixth circuit about it, the test, whether a reasonable police officer and some of the, some of the, uh, case lightning says a reasonable person. Um, I couldn't imagine anybody that would think that you could stand out screaming in your front porch like this, or out in your lawn at one o'clock in the morning in a residential area. And, um, that it, it won't, it will police a police response and ultimately arrest when you don't stop after you've been warned. Um, so the, the test is not whether or not it's a conviction, the test is whether or not it's probable cause. Um, and which I believe is met by that. And, uh, I couldn't imagine anybody suggesting that they wouldn't think somebody would be arrested for that or that there wouldn't be, uh, some police action on it because this is a neighborhood by Mr. Uh, Henry's own admission. While, while he tried to say he wasn't yelling and screaming, but yes, my voice is loud and booming. Um, he also indicated that it's like an echo chamber there and he's yelling in the neighbor, in the neighborhood. So, um, This is after the officers say, come over here and talk to me man to man. Right. Yep. Those are some of the earlier statements. But, um, our, our position is once the light goes on, um, they could have effectuated an arrest immediately. Wasn't going to, uh, it seemed like things were going to fade away. And then ultimately, uh, they, the sentences come out about arrest or about threatening you. And, uh, ultimately Coe decides to go and arrest him. Coe has to leave from the street to go up to toward his porch. The plaintiff in his testimony, there's no way to get him to testify cleanly when he realized that somebody was coming up to arrest him. Uh, and then he told me you're trying to get me to say it's a surprise or something. He would not respond to the question. But ultimately he's near the stairs and his shirt is grabbed by the officer and it actually gets torn off. And then he testifies that, uh, this caused me to, I was going to fall. And then I fall toward into my house to go into the house. And if you watch the video, At that point they're up on the porch apparently. Yes. And you see the video going into the house and the actual phone going in the house. And I think leaving his hand at that point. And then there's the screaming continues as they're on the porch where, uh, at that time, Coe is joined by Hennigy and then they're joined by White. And then the statements are made about, um, give me your hands. Uh, you know, the, the girlfriend then picks up the phone and screaming this whole time and then she screams how they throw him down and put him down. But if you go through the time span, it took a minute and a half to eventually affect the cuffing on him. Uh, the video shows he's a strong man. Uh, he's heavily muscled. And, uh, this is, uh, three police officers that it took to finally get him down and White is a large guy and took him down to the ground. Let me just go back to one thing. This may, may be extra record, but I had the image of this house where they're going to try to find the sister, uh, as being right next to his house. But from the numbering, it looks like there's a house in between. Does that, do you, did that come out? You think they are? Yes. Seven Oh, or is it because the record, they talk about 1714, which is his house and 1706, which is the number that they went for the sister. They do a butt. Sorry? They do a butt. And it was for the sister of the. Yeah, no, I understand that. So you're saying that 1706 and 1714 are next to each other. Yes. All right. That's not what the map seems to show, but that may be extra record. Yep. Um, that's what the testimony is because they had been sweeping that house for fugitives and they came around to his side of the house. Are they, how close are the, um, you're saying the yards are next to each other, but are the houses 50 feet away, 10 feet away, the physical house. Yeah, it's all outside the record. There, there is a distance as a driveway. So there's a driveway and maybe some, some curtilage between the properties. If you look at it, an extra record is that these are like on 25, these are like on 25 foot lots, it looks like. It's small, tight, tight housing in there. Um, but anyhow, so I, by the plaintiff's own testimony, he says, I have to fall somewhere, so I'm going to fall toward my house that's evading him. And, uh, the officers come and they end up, uh, according to Williams, uh, he's struggling the whole time. The testimony and, or not the testimony, but the recording is very clearly, give me your hands. And, uh, there's no stopping. There's only continued yelling from Mr. Henry and it's real clear. There's a struggle going on. Um, that's by this, the audio by Ms. Williams, by the police officers. Uh, he alleges that he wasn't struggling, but if we look at the perception, um, he also said that he wasn't trying to flee and we know he chose to have to fall into the house, which could be interpreted by fleeing as the police officers, if, if, I mean, whatever the story is to be bought, but it still goes to the faith of the police officers, what they're believing that he's fleeing and trying to go in the house. Uh, ultimately they do, uh, grab him on the porch and they can't control him. They spray him one time on a short spray. Uh, it's not sniper CO spray. Uh, this stuff is, uh, not direct stream. Uh, the police officers got hit. If you listen to the video, uh, Hennigy is complaining that, you know, we, we got hit too. Uh, they all get hit. Um, or, or the, the ones other than the guys spraying co, but, uh, so they're, they're sprayed and then the issue comes, uh, leaving their tour toward, uh, the transport. And, uh, at that point there, there's not a statement with regard to the cuffs. Um, it's our assertion in the trial court found, uh, that there was justifiable use of the pepper spray. Um, the next matter goes to the, uh, arrest. Uh, we already covered that with regard to the, uh, issue of disturbing the peace. Uh, next one is retaliation. Um, there's some, some authority suggestion. You can't have retaliation where there's already probable cause for just arrest. So, um, we would rely on that. Uh, but also aside from that, there's not really any evidence that the police officers are reacting to this gentleman saying he's going to file a complaint with the administration downtown against them, there's never that clear statement ever being made that he's going to go to file a complaint against them with the administration downtown. Um, they, uh, testified. Can it be retaliation for just bad mouthing him, which he clearly, clearly is. I mean, there's, there is tension in the room. He's being very nasty to them. They may be being nasty to him, but if you, if you think, if there is retaliation, there's a basis for believing it, right? Well, there's no clear evidence on it. And the design inference there is it's speculation. So it's speculation conjecture that they're retaliating, but nonetheless, as I indicated, there's the authority line saying that if you have a probable cause for another arrest, uh, then there's not the retaliatory. Um, with regard to this, you'll need to wrap up. Your time has expired. Good. Anything, any concluding remarks? Um, on behalf of the officers, we just, uh, requested to affirm judge Borman. Okay. Thank you. Thank you, your honors. I have just a few points now. Um, I would just like to point, uh, the court to the, the testimony on page 2238 of the record, which is officer White's testimony. He actually says he can't remember if Mr. Henry asked him before, uh, getting to the jail. That's not a denial. That's also Mr. White not remembering if he asked prior. I just, I just wanted to point that out. And that's on page 2238 of, of the, of the record here. And, um, second, I also want to point out, uh, that while the light went on and while this is not included in the briefing, it is in Mr. Henry's testimony that his neighbor, his name was Rick and Rick was not home that night and that is on page 1971 of the record and Mr. Henry says, Rick is the neighbor. Does that mean adjoining on one side or the other? It doesn't specify, but he says the neighbor next door and that it would be the house I presume Mr. Rick went in and was in, in the house that was next door. I think he says the east. Is that the yard the officers were in? That is, do you agree that 1706 and 1714, uh, join each other, that there's not a 1710 in between? I do believe that is the case, but I am, but I am not sure. I'm not a hundred percent sure. I could, I can find out. Um, I can, if, would the court want to know that for sure? I can bring that to you tomorrow. I think the record is what the record is. Okay. Um, but wasn't it your understanding? Just weren't you assuming the houses were next to each other? I did. That was my assuming your honor. And then finally, one last point about, um, well, uh, brother counsel said there was no evidence that, uh, Mr. Henry stated that he was going to make a complaint downtown. There's also really no evidence that he threatened any physical violence against the officers. Given the context of what he was saying, he just confirms that he did use the word threat. I don't think there's any evidence that he... The audio is not great on that. I got to say. Uh, I do agree with you, your honor. I would not speak. I don't approve of the words he used. Yes. Your judge... Well, that would knock out all of this record. He does say some... On the other hand, the phrase, that's not a threat. It's a promise is, is something that lots of people say, politicians, you know, are you threatening to vote against me? No, that's a promise. I'm going to vote against you. It's almost as if the officers knew Alanis and said, is it a true threat? And he said, you bet it's a true threat. What are you going to do? And I think the officers knew that he wasn't threatening physical violence there and wanted him to confirm that he did say the word threat, but that is just plaintiff's point of view on that. And I am out of, I have 20 seconds left. So I would just like to point out that in this case, it's a motion for summary judgment and facts and inferences should be viewed in the favor of the non-moving party, which are Mr. Henry and Ms. Williams here, is the plaintiff's position that the district court viewed many facts and made inferences in the non-moving party's favor. And further, there are material questions of fact as to the reasonableness of the officer's conduct in this case. And so plaintiff's just respectfully request this court reverse Judge Worman on this issue. Thank you very much. Okay. Well, thank you, Ms. Sinkovich and Mr. Gus for your arguments this morning. We, we do appreciate them. The case will be submitted and.